*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KAMIE LYNE FOX,

      Plaintiff-Counterdefendant-Appellee,

UNPUBLISHED
January 25, 2024

v

GERALD ROBERT FOX,

      Defendant-Counterplaintiff-Appellant.

No. 362545
Eaton Circuit Court
Family Division
LC No. 21-000666-DO

Before: GARRETT, P.J., and LETICA and MALDONADO, JJ.

PER CURIAM.

Defendant appeals as of right the judgment of divorce, challenging the trial court's division of property and its determination that certain property was marital property. We affirm.

## I. BASIC FACTS

The parties estimated that they began their relationship in 2011. Within a year or two, defendant and his daughter, from a prior marriage, moved into plaintiff's home on Doe Pass (the "Doe Pass property") in Lansing, where plaintiff lived with her two minor children from a prior marriage. The parties married in April 2014.

Both parties were employed during the marriage. Initially, plaintiff was employed by Great Wolf Lodge, and defendant was employed at Fox Brothers, a family business in Lansing. After the marriage, the parties continued to maintain their separate bank accounts where they deposited their incomes and from which they paid their individual credit card bills and expenses. Plaintiff's accounts were at Lansing Automakers Federal Credit Union (LAFCU), and defendant's accounts were at Comerica. Plaintiff paid the mortgage and monthly utility expenses for the Doe Pass property from her separate checking account before and after the marriage. Occasionally, she asked defendant to contribute to those expenses from his separate account when her account balance became too low.

In 2014 plaintiff obtained a mortgage to purchase a cottage on Houghton Lake (the "cottage"), and the cottage was titled in her name.[1] Plaintiff's parents provided $25,000 for the down payment on the cottage. The parties made significant renovations to the cottage shortly after it was purchased. Plaintiff assisted in maintaining the interior and exterior of the cottage. She also paid the mortgage and monthly utility payments from her separate checking account. The parties and their children spent time at the cottage.

The Fox Brothers business was sold in May 2016, and defendant received his first payout of $738,756. Defendant did not deposit this payout into his separate Comerica account. Instead, the parties opened a joint money market account (MMA) at LAFCU and deposited the payout there. The MMA was also linked to plaintiff's separate accounts. According to defendant, his intention when he deposited the check into the joint MMA was to use the funds for the benefit of the family, for the parties' retirement, and for investments. He also expressed that it would be easier for plaintiff to pay the marital expenses by having access to funds. He did not, however, discuss with plaintiff "how the money was going to be spent." Plaintiff agreed that the joint MMA was "going to be our future. Our retirement." She also agreed that she and defendant did not have any discussion about the use of the funds in the joint MMA, but defendant did not put any restrictions on her use of the joint MMA funds. Plaintiff continued to pay the mortgage and utility expenses for the Doe Pass property and for the cottage from her separate account. She transferred funds from the joint MMA for marital expenses when her account balance became low.

Both parties changed jobs during the marriage. After Fox Brothers was sold, defendant began working for Quarry Ridge Stone. Plaintiff became employed with Crystal Mountain. The parties' incomes were comparable, with plaintiff earning about $53,000 annually, and defendant earning about $50,000 annually. Defendant also received monthly rental income.

Defendant received $131,093 in July 2016 for his share of the accounts payable related to the sale of Fox Brothers. This money was also deposited into the joint MMA. In August 2016, the parties agreed to pay off the $137,025 balance on the cottage mortgage with funds from the MMA. The parties also decided to repay plaintiff's parents for the $25,000 down payment on the cottage.[2] For the repayment, defendant used funds from his individual checking account.

The parties purchased a house in Grand Ledge that was in foreclosure (the "Lydia Lane property") in December 2016. The $185,130 purchase price was paid with funds from the joint MMA, and the property was titled in both parties' names. Extensive renovations were made to the Lydia Lane property that totaled approximately $121,000. Plaintiff would transfer funds from the joint MMA to her separate checking account and write checks from her account for the renovation expenses. Plaintiff and her children, and defendant and his daughter, moved into the home on Lydia Lane in August 2017. The utilities for the home were in plaintiff's name. Plaintiff was responsible for maintaining the interior of the home. Defendant initially took care of the lawn

---

[1] The decision to purchase the property in plaintiff's name only was apparently made in light of defendant's credit rating.

[2] Plaintiff's parents instructed the parties to use the $25,000 to purchase Michigan Education Trusts for plaintiff's children.

before plaintiff's son assumed responsibility for mowing the lawn. Plaintiff continued to pay all expenses for the cottage, as well as the expenses for the marital home, from her separate checking account. According to plaintiff, she paid the expenses for the cottage and the marital home from her checking account first, and if the money in her account ran low because of nonroutine family expenses, she would transfer money from the joint MMA to her separate account. She transferred funds from the MMA to her account to pay marital expenses about nine times, generally in the amount of about $2,000 each time.[3] The property taxes and insurance for the cottage and the marital home were paid with funds from the joint MMA.

In December 2017, the parties agreed to pay off the $131,500 mortgage balance on the Doe Pass property with funds from the joint MMA. The Doe Pass property was sold in March 2018 and the proceeds of $190,592 were deposited into the joint MMA. In May 2018, the parties agreed to invest $42,500 to purchase additional shares of stock in Quarry Ridge Stone using funds from the joint MMA.

In August 2018, the parties agreed to loan $100,000 to defendant's brother using funds from the joint MMA. In addition, at various times, assets were purchased with funds from the joint MMA, including a dock, two boat lifts, a water trampoline, a 2013 Lund fishing boat and Shorelander trailer, and a 2019 Chevrolet Silverado. At the time of trial, $25,000 remained payable on the loan to defendant's brother.

In December 2018, defendant received $81,448.62 from the sale of a building that had been owned by Fox Brothers. The funds were deposited into the joint MMA.

Plaintiff filed for divorce on July 13, 2021. At that time, the balance in the joint MMA was approximately $130,736. Plaintiff continued to pay the expenses for the cottage and the marital home from her separate account. She also continued to pay the family automobile insurance and health insurance premiums. At that time, plaintiff was residing in the marital home with her children, and defendant was residing in the cottage. At trial, plaintiff provided a detailed chart of all deposits into, and expenditures from, the joint MMA from its inception on May 16, 2016, through May 1, 2022.[4]

---

[3] The parties agreed that defendant paid the utility expenses for the marital home with funds from his individual account from December 2019 to November 2020. Plaintiff testified that during this time the premium she paid for the family's health insurance increased by $550 a month. Plaintiff resumed paying the utility expenses for the marital home in December 2020.

[4] The chart showed that the funds in the joint MMA were used: to pay federal and state income taxes for tax year 2016 ($150,275); to purchase the Lydia Lane property ($185,130); to renovate the Lydia Lane property ($121,000); to pay off the mortgage on the Doe Pass property ($131,551); to invest in Quarry Ridge Stone ($42,500); to make a loan to defendant's brother ($100,000); to purchase assets for the cottage, including the boat dock and lifts, the Lund fishing boat, and the water trampoline; to purchase a Chevrolet Silverado; to pay for vacations, to purchase gifts; to pay the insurance and property taxes on the cottage and the Lydia Lane property; to contribute to

After mediation in December 2021, plaintiff began to use the MMA funds to pay for the marital expenses. At the time of trial, the balance in the joint MMA was reduced to $89,000. Plaintiff testified that if she had known that defendant would take the position that the funds in the joint MMA were his separate property she would have handled the finances differently during the marriage. Specifically, plaintiff would have had defendant pay the bills "all along" so that she would have had money for "extras," such as vacations, retirement, and savings. She testified to being limited in her retirement contributions because she was paying nearly all of the marital expenses. But, plaintiff believed that the MMA was intended to provide for the couple in their future.

According to defendant, he was the "provider," and plaintiff was the "business manager." Plaintiff generally did not address small purchases with defendant, but would consult him about "bigger ticket" items. Defendant was unaware of what the monthly utility bills were. He thought that plaintiff earned enough income to pay the marital expenses. Defendant believed that plaintiff's payment of the marital expenses from her separate account was an exchange for his contribution of paying off the Doe Pass and cottage mortgages and paying for the marital home and renovations with funds from the joint MMA. He did not access the joint MMA or check the balance regularly. When he wanted to know the balance, he would have the teller at the bank write the balance on a piece of paper. Defendant testified that when he learned that plaintiff was taking money from the joint MMA to replenish her checking account when she did not have enough money to pay the marital bills, he told her "not to do that anymore."

The parties reached an agreement on some issues, including who would receive certain personal property, who would receive certain marital property, and the value of various assets. The court aptly summarized the issues in dispute in a written opinion and order:

> The primary issue in this case is whether the funds deposited into the MMA should be designated as separate or marital property. Defendant-Husband seeks the Court to designate all MMA funds as his premarital property and to reimburse him for or award him as his separate property any assets purchased with MMA funds, with no marital value placed on said assets. Plaintiff-Wife seeks for the Court to treat the MMA funds and any purchases with the funds as wholly marital. Resolution of this issue affects the assignable marital value of the following assets: the Lydia Property; the Cottage; the $42,500 investment in Quarry Ridge Stone, Inc.; the $25,000.00 promissory note, payable by Bob Fox; the 2013 Shorelander Trailer; the 2013 Lund 1775 Impact Fishing Boat; the 2019 Chevrolet Silverado; the boat dock with two (2) lifts; and the remaining balance of the funds in the MMA.

The court found that the parties' actions and decisions overwhelmingly demonstrated that the parties' intent at the time of opening the joint MMA was to create a joint or marital asset during

---

monthly marital expenses; and to pay other various expenses, such as medical bills and veterinary bills.

the marriage.[5] The court found that the joint MMA and the assets purchased with funds from the joint MMA were to be considered marital property up until the time of the divorce filing.[6] Specifically, the court found that

> In this case, the evidence overwhelmingly demonstrates Defendant-Husband's true intent at [the] time of opening the MMA was to create a joint or marital asset. As noted above, at the time the parties married on April 10, 2014, each had their own bank accounts at separate banking institutions. Plaintiff-Wife had savings and checking accounts at LAFCU while Defendant-Husband had savings and checking accounts at Comerica. Both parties worked and put their money into their respective individual accounts. Yet, when Defendant-Husband received the initial Fox Brothers payout, he chose not to put it into his Comerica accounts. Instead, he opened an MMA at LAFCU jointly with Plaintiff-Wife, indicating to her that the money was for their family, renovations to their property, and retirement. The parties then used the funds for just that. More specifically, the funds were used for the following: paying off the mortgage on Doe Pass, titled at the time solely in Plaintiff-Wife's name; buying and renovating the Lydia property, jointly titling the home in both their names; and renovating the Cottage and purchasing motorized items for use at the Cottage, which was and is still titled only in Plaintiff-Wife's name. Sale proceeds from Doe Pass were in turn deposited into the MMA. Plaintiff-Wife maintained all records and checks for the MMA. The aforementioned actions are all indicative of the marital nature of the MMA.

The court found that the Lydia Lane property, the cottage, the $42,500 investment in Quarry Ridge Stone, the 2013 Shorelander trailer, the 2013 Lund fishing boat, the 2019 Chevrolet Silverado, and the boat dock and two lifts were marital property. Further, it determined that defendant would not receive from the property division reimbursement for joint MMA funds used in the payoff or purchase of the assets. The court treated the $25,000 owed on the loan to defendant's brother as defendant's separate property.

## II. MARITAL PROPERTY

Defendant contends that the trial court erred by finding that the separate funds that he deposited into the joint MMA were marital property because the record established that the parties' conduct and intent was to treat the joint MMA as a separate asset. We disagree.

---

[5] The trial court found defendant's testimony "not credible regarding his view of the joint MMA funds as separate property during the parties' marriage[.]"

[6] The court found that after plaintiff filed for divorce the parties' intent regarding the joint MMA shifted and that the parties viewed the joint MMA as separate property. And, equity dictated that expenditures made after the divorce filing should be considered separate expenditures unless necessary to preserve marital assets. The court also found that the balance remaining in the joint MMA at the time of plaintiff's filing ($130,736) was defendant's separate property.

In reviewing a trial court's division of the marital estate, this Court reviews the trial court's factual findings for clear error. *Berger v Berger*, 277 Mich App 700, 717; 747 NW2d 336 (2008). "A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake was made." *Loutts v Loutts*, 298 Mich App 21, 26; 826 NW2d 152 (2012). Special deference must be given to findings of fact if those findings are based upon the credibility of a witness. *Johnson v Johnson*, 276 Mich App 1, 11; 739 NW2d 877 (2007). If the trial court's findings are not clearly erroneous, the reviewing court must then decide whether the dispositional ruling was fair and equitable in light of the facts. *Sparks v Sparks*, 440 Mich 141, 151-152; 485 NW2d 893 (1992); *Richards v Richards*, 310 Mich App 683, 693-694; 874 NW2d 704 (2015). The trial court's dispositional ruling must be affirmed unless this Court is firmly convinced that it was inequitable. *Sparks*, 440 Mich at 152. "Although marital property need not be divided equally, it must be divided equitably in light of a court's evaluation of the parties' contributions, faults, and needs." *Richards*, 310 Mich at 694.

Before dividing assets, the trial court must determine what is marital property and what is separate property. *Cunningham v Cunningham*, 289 Mich App 195, 200-201; 795 NW2d 826 (2010). "Generally, marital property is that which is acquired or earned during the marriage, whereas separate property is that which is obtained or earned before the marriage." *Id*. at 201, citing MCL 552.19. "[W]hen the marital estate is divided each party takes away from the marriage that party's own separate estate with no invasion by the other party." *Id*. at 201 (quotation marks and citation omitted). The marital property is then apportioned "between the parties in a manner that is equitable in light of all the circumstances." *Id*. Generally, each party takes their own separate property. *Id*. at 201; *Reeves v Reeves*, 226 Mich App 490, 494; 575 NW2d 1 (1997). Separate assets may become marital property if the assets are commingled with marital assets and are treated as marital property by the parties. See *Pickering v Pickering*, 268 Mich App 1, 12-13; 706 NW2d 835 (2005). "The mere fact that property may be held jointly or individually is not necessarily dispositive of whether the property is classified as separate or marital." *Cunningham*, 289 Mich App at 201-202. "The actions and course of conduct taken by the parties are the clearest indicia of whether property is treated or considered as marital, rather than separate, property." *Id*. at 209.

The *Cunningham* Court addressed whether, and to what extent, workers' compensation benefits received during a marriage are considered marital property. *Id*. at 196. In that case, the defendant, at the age of 16, suffered a permanent disabling injury while employed in construction work. While lengthy litigation regarding his claim for workers' compensation benefits was pending, the defendant married the plaintiff in 1982. The claim for workers' compensation benefits was resolved in 1987, with the defendant receiving a lifetime award of benefits, paid monthly. The parties used the monthly benefits to defray ongoing marital expenses. *Id*. at 197. The defendant was also awarded a lump-sum payment of $150,000 retroactive to the date of injury. *Id*. at 197-198. The entire retroactive award was deposited into the parties' joint savings account. *Id*. at 198. The same year, the parties purchased their second marital home with $90,000 from the defendant's retroactive award, $25,000 in proceeds from the sale of the parties' first home, which they had purchased together when they married, and approximately $20,000 from the plaintiff's premarital 401(k). The remaining $60,000 of the retroactive award remained in the parties' joint savings account and was spent during their 25-year marriage. At the time of the divorce proceedings, the home was valued at $252,000 and had an outstanding mortgage balance of

approximately $56,000. The parties disputed the distribution of the equity in the marital home. *Id*. at 198-199.

The plaintiff argued that the defendant's entire retroactive workers' compensation award was marital property subject to equitable division because it was received during the marriage. This Court disagreed, holding that such benefits are marital property subject to division only to the extent that they compensate for wages lost during the marriage. *Id*. at 196, 207.

The plaintiff also argued that the trial court erred by finding that the portion of the retroactive award used to purchase the marital home was the defendant's separate property. In particular, the plaintiff asserted that the $90,000 portion of the retroactive award lost its character as separate property when it was deposited in a joint account and used, along with other marital funds, to purchase the marital home. *Id*. at 207. Under those circumstances, this Court agreed:

> Five years after the parties married, defendant received a lifetime workers' compensation award, as well as a $150,000 lump-sum award retroactive to the date of injury. At that point, the portion of the funds that compensated defendant for wages lost before the marriage was defendant's separate property. However, defendant took no steps to maintain those funds as his individual property. Rather, he deposited those funds in a joint account in which both parties regularly deposited funds from their own earnings. Thereafter, he commingled $90,000 of the retroactive award with funds from plaintiff's premarital retirement account, as well as with the proceeds from the sale of the parties' previous marital home, which had been purchased with both parties' savings. These monies were used to jointly purchase the marital home, which the parties continued to live in for the duration of their marriage, approximately 20 years. Although the award of workers' compensation benefits derived from litigation predating the parties' marriage, and a portion of it is theoretically traceable as defendant's separate property, defendant's actions after receiving the funds established that he intended to contribute $90,000 of those funds to the marital purpose of acquiring a new home. [*Id*. at 207-208.]

This Court further rejected the argument that separate property that has been commingled to purchase property is properly considered a separate asset and must be returned to a party upon divorce. *Cunningham*, 289 Mich App at 208. This Court stated:

> In this case, . . . [the] defendant and plaintiff jointly purchased the marital home by combining their separate funds (assuming a portion of the $90,000 from the retroactive award consisted of defendant's premarital lost wages) as well as some of their joint funds, for the down payment. Moreover, and perhaps most significantly, defendant . . . did not purchase the marital home individually and with solely his own funds *before* the parties' marriage. Nor was the entire down payment on the home provided solely from defendant. Rather, the parties in the instant case were already married at the time of purchase, purchased the home from their combined resources, and continued to live in the marital home for nearly 20 years. The fact that the monies defendant used derived from litigation predating the marriage is irrelevant. The bottom line remains that defendant, during his marriage

to plaintiff, commingled his theoretically separate funds with marital funds and some of plaintiff's separate funds to jointly accomplish the marital goal of purchasing a home. The actions and course of conduct taken by the parties are the clearest indicia of whether property is treated or considered as marital, rather than separate, property. On this record, there is no evidence from which to conclude that defendant considered the funds his separate property or that it retained its separate character. Thus, . . . because defendant commingled those monies with marital funds and with plaintiff's separate funds to purchase the marital home, it lost any separate character it may have had and should have been included in the marital estate. See *Pickering*, 268 Mich App at 12-13. The trial court erred by finding that defendant's $90,000 portion of the down payment constituted separate property and by excluding it from the marital estate. [*Id*. at 208-209.]

In the present case, the trial court followed *Cunningham*'s instruction that the clearest indication of whether property is separate or marital are the parties' actions and course of conduct. In this case, both parties were employed when they met and married. By all accounts, they kept their individual finances separate, with each party depositing their income into their separate accounts and paying their individual expenses from their separate accounts. Before and after the marriage, however, plaintiff paid the utility bills and the mortgage for the cottage, as well as the family's automobile insurance and the parties' health insurance premiums, from her separate checking account, with only occasional contributions for these marital expenses from defendant's separate account. When defendant received his initial payment from the sale of Fox Brothers in May 2016, he deposited the funds into a then newly created MMA that was jointly titled rather than depositing the funds into his separate account. There is no dispute that defendant's separate property was used to initially fund the account. Yet, both parties testified that the intention when opening the joint MMA was to use the funds to provide for the family, for the parties' retirement, and for investments. Defendant subsequently deposited additional funds from the sale of Fox Brothers into the joint MMA in July 2016 and December 2018. Plaintiff also deposited the proceeds from the sale of her separate Doe Pass property into the joint MMA. Consistent with their intentions, the parties used the funds in the joint MMA to purchase the marital home on Lydia Lane and to fund extensive renovations to that home, which was jointly titled. The funds were also used to pay off the mortgage on the Doe Pass property after the marital home was purchased, to pay off the mortgage on the family cottage, and to purchase various assets, including a dock, lifts, a boat, a water trampoline, and a pickup truck. The funds were used to invest in stock in Quarry Ridge and to pay for family vacations. After the joint MMA was established, plaintiff continued to pay the marital expenses for the cottage, the Lydia Lane home, the family automobile insurance, and the family health insurance premiums from her separate account. She used funds from the joint MMA toward those marital expenses approximately nine times when she did not have enough funds in her separate account to pay the marital expenses. The testimony established that both parties contributed funds to the joint MMA, that the parties used the joint MMA funds for marital expenses and expenditures, and that they each expressed the intent to use the funds for marital purposes. Moreover, we defer to the trial court's determination that defendant's testimony, addressing the MMA as separate property, was not credible. *Johnson*, 276 Mich App at 11. Accordingly, there is no evidence from which to conclude that defendant considered the funds his separate property or that the funds retained their separate character. In light of the parties' actions and intent, the trial court did not clearly err in determining that the joint MMA and assets purchased

with funds from the joint MMA during the marriage were marital property. *Berger*, 277 Mich App at 717.

## III. DIVISION OF MARITAL PROPERTY

Defendant submits that even if the trial court properly considered the funds in the joint MMA and assets purchased with the funds during the marriage to be marital property, the court failed to reach a fair and equitable distribution of the marital property. We disagree.

A trial court's goal when dividing the marital estate is to arrive at an equitable division of the property considering the specific circumstances of the case. *Seifeddine v Jaber*, 327 Mich App 514, 522; 934 NW2d 64 (2019). While "mathematical equality" is not required, the court must explain "any significant departure from congruence." *Id*. The court may also weigh the following factors in dividing the marital estate:

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. [*Sparks*, 440 Mich at 159-160.]

In submitting that the trial court's division of property resulted in an inequitable distribution, defendant does little to address the *Sparks* factors in light of the trial court's factual findings. He focuses only on a single factor: contributions of the parties to the marital estate. However, the trial court is to weigh all the relevant factors and "not assign disproportionate weight to any one circumstance." *Sparks*, 440 Mich at 158. The gist of defendant's argument is that he contributed 94% of the funds deposited into the joint MMA and that equity dictates that he should receive 94% of the marital property. We note that the court awarded plaintiff 48.81% of the marital property and awarded defendant 51.19% of the marital property. Plaintiff's award consisted mostly of the Lydia Lane property ($430,000 out of a total award of $483,305).

In its opinion, the trial court considered the *Sparks* factors, including the parties' contributions to the marital estate. The court noted that the parties both worked during the marriage and contributed to the marital expenses, but also that defendant deposited a total of $951,297.30 from the sale of Fox Brothers into the joint MMA and that plaintiff deposited net proceeds of $59,042 from the sale of the Doe Pass property into the joint MMA. The court then discussed what happened to those funds after they were deposited into the joint MMA and used during the marriage to purchase family assets and for family expenses as the parties intended. The court also acknowledged that plaintiff paid most of the marital expenses for the parties' properties from her own account. Indeed, plaintiff presented evidence that she paid marital expenses totaling $197,242.42 from her separate account.[7] The court found, "on the basis of the equities in this

---

[7] Plaintiff was unsure of the amounts contributed by defendant from his individual account or transferred from the joint MMA toward the marital expenses, but she testified that the amount transferred from the joint MMA was at most $14,000.

case," that plaintiff would be awarded the marital home. The only other marital assets that she received were the balances in her separate checking and savings account, a 2014 Chevrolet Cruze and a 2014 GMC Acadia, and the cash surrender value of her life insurance.[8] Defendant received the cottage, the balances in his separate checking and savings accounts, the Quarry Stone Investment, two trailers, two snowmobiles, the Lund boat and motor, the 2019 Chevrolet Silverado, a John Deere tractor, and the dock and two lifts. The court acknowledged that a difference existed in the total value of the assets awarded to the parties, but stated that "given the circumstances of this case, equity does not require an equalization payment from Defendant-Husband to Plaintiff-Wife." Under the circumstances, the trial court's decision does not leave us with the firm conviction that the distribution was inequitable. *Seifeddine*, 327 Mich App at 522.

Affirmed. Plaintiff, the prevailing party, may tax costs. MCR 7.219(A)(1).

/s/ Kristina Robinson Garrett
/s/ Anica Letica
/s/ Allie Greenleaf Maldonado

---

[8] The court also awarded plaintiff $27,591.49 as an advanced distribution from her unauthorized expenditures after she filed for divorce.

-10-